**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **TOTAL QUALITY LOGISTICS, LLC,** | : | |
| 4289 Ivy Pointe Boulevard | : | **Case No.:** _____ |
| Cincinnati, Ohio 45245 | : | |
| | : | **Judge:** _____ |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **NADEEM QURESHI** | : | |
| 5019 Lakeridge Drive | : | |
| Old Hickory, Tennessee 37138 | : | |
| | : | |
| **Defendant.** | : | |

<u>**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**</u>

For its Verified Complaint against Defendant Nadeem Qureshi ("Qureshi"), Plaintiff Total Quality Logistics, LLC ("TQL") states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.      TQL is an Ohio limited liability company with its principal place of business located in Clermont County, Ohio. TQL provides freight brokerage and third-party logistics services to customers across the continental United States.

2.      Qureshi is a Tennessee resident. Upon information and belief, his last known address was 5019 Lakeridge Drive, Old Hickory, Tennessee 37138. Qureshi previously worked as an employee of TQL in its Nashville, Tennessee office.

3.      Jurisdiction and venue are appropriate because the Employee Non-Compete, Confidentiality and Non-Solicitation Agreement governing TQL's employment relationship with Qureshi provides for jurisdiction and venue in the Southern District of Ohio; all improper acts and conduct were purposely directed toward TQL's systems located at its Clermont County, Ohio

headquarters; and at least part of TQL's claims for relief arose in Clermont County, Ohio. Further, this Court has subject matter jurisdiction based on diversity and federal question jurisdiction.

## FACTS COMMON TO ALL COUNTS

4.      TQL is a national leader in the third-party logistics industry, providing shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and assistance with supply-chain management across the continental United States.

5.      TQL's customers consist of companies that want to ship goods from one location to another.  These customers include companies that need to ship their own goods.  However, many of TQL's customers also include other freight brokers that have already agreed to ship goods on behalf of another customer, but need assistance in finding a carrier to fulfill the shipment.

6.      TQL does not own, operate, or lease any of its own trucks. Nor does TQL employ any drivers to haul freight.  Rather, TQL engages and coordinates independent carriers that are able and willing to haul freight at the times and places required by TQL's customers.

7.      The third-party logistics industry (and the freight-shipping industry at large) is extremely competitive. Relationships with customers, carriers, and other brokers are critical to success.  It is very common in the brokerage industry for companies to have non-compete and non-solicitation agreements with their employees and contractors.

8.      Among other things, TQL's relationships with customers and carriers are essential to sustained success within the industry.  TQL spends a great deal of time, money, and other resources developing relationships with new customers and strengthening relationships with existing ones.

2

9.     Further, TQL has made substantial investments to develop and protect the secrecy of its proprietary systems, processes, and procedures that it uses to manage operations and to compete in the hyper-competitive industry.

10.     In addition, TQL maintains and closely protects its trade secrets and other confidential and proprietary information by conditioning employee access upon the use of constantly changing passwords.  Likewise, TQL's systems implement internal controls that prevent employees from downloading or printing certain information, as well as restrictions on sending confidential information outside TQL's secured network.

11.     As further protection of its trade secrets and other confidential and proprietary information, all freight brokers, as well as many other types of employees, before beginning employment at TQL must sign restrictive covenants that restrict their ability to unfairly compete with TQL, to solicit TQL's customers or employees, and to disclose or misuse TQL's trade secrets and confidential and proprietary information.

12.     Qureshi worked at TQL from May 8, 2018 to November 10, 2022.

13.     Qureshi did not have any experience in the third-party logistics industry prior to joining TQL. Therefore, TQL provided Qureshi with extensive training on matters that included its services, pricing structure, sales strategies, customers, and general operations. TQL's logistics training program is so intensive that it generally takes between 8 and 26 weeks to complete.

14.     Qureshi succeeded through TQL's comprehensive and unique training system. He began as a Logistics Account Executive Trainee and then progressed to become a Logistics Account Executive, a Logistics Account Executive Saturday Group Leader, and finally, a Senior Logistics Account Executive.

15.    Throughout his employment with TQL, Qureshi acquired detailed knowledge of TQL's unique operations, including, without limitation: shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and supply-chain management services. Qureshi also had extensive access to TQL's confidential, highly-proprietary, and/or trade secret information for use in the performance of his job duties, including: proprietary software, operating policies and procedures, financial records (such as credit history and other similar information about current and prospective customers, suppliers, and motor carriers), information about pricing and the manner and mode of doing business, the terms of TQL's business dealings and relationships with customers and motor carriers, contracts and agreements of all kinds, sales lists and strategies, and detailed customer and motor carrier lists and information.

16.    Qureshi was also required to manage relationships with TQL's existing customers and to develop relationships with prospective customers. Qureshi developed close relationships with and had an intimate knowledge of these TQL customers and the motor carriers that TQL contracted with to transport TQL customers' freight.  In fact, Qureshi served as the primary point of contact with TQL customers with whom he interacted.

17.    On March 26, 2018, before he began working at TQL, Qureshi and TQL executed an Employee Non-Compete, Confidentiality and Non-Solicitation Agreement (the "Agreement"), a true and accurate copy of which is attached hereto as Exhibit A.

18.    The Agreement defines what constitutes "Confidential Information" for purposes of the Agreement, and where "Confidential Information" is used below, it incorporates the Agreement's definition of Confidential Information.

19.    In the Agreement, Qureshi agreed, among other things, that during the course of his employment with TQL and for a period of one year after his employment with TQL ended, that he

4

would not (a) directly or indirectly own, operate maintain, consult with, be employed by (including self-employment), engage in, or have any other interest in any business or entity that competes with TQL; (b) directly or indirectly solicit any TQL customer or carrier, or take any action to divert work from TQL or work for or associate with any TQL competitor; (c) directly or indirectly interfere or tamper with, disrupt or attempt to disrupt any contractual or business relationship TQL has with any customers or carriers; or (d) employ, recruit, solicit, or assist others in employing, recruiting, or soliciting any person who has been employed with TQL within the previous twelve months.

20.     Qureshi further agreed that during and after his employment with TQL, he would not "use for any purpose or publish, copy, disclose, or communicate to any individual, firm, corporation, or other business entity other than TQL, any Confidential Information, except as properly necessary and authorized by TQL in the conduct of TQL's business or as required by law." The Agreement explained "that all information disclosed to Employee or to which Employee has access during the period of his or her employment shall be presumed to be Confidential Information hereunder if there is any reasonable basis to believe it to be Confidential Information or if TQL appears to treat it as confidential."

21.     Finally, Qureshi agreed that TQL would be entitled to an award of attorneys' fees if TQL had to bring an action against him to enforce the terms of the Agreement.

22.     In September 2022, Qureshi attempted to solicit another TQL employee to take part in a plan Qureshi had developed to take TQL Confidential Information to a competitor, to unfairly compete with TQL.

23.     As part of his plan, Qureshi surreptitiously obtained many hours of recordings using a personal computer that captured the screen of his TQL-provided computer as he searched through TQL's internal databases.

24.     Qureshi's intent was to preserve TQL's Confidential Information on his personal computer so that he could have it after he departed TQL.

25.     After failing to recruit the first TQL employee he approached, Qureshi approached another one. That employee willingly joined Qureshi's plan and resigned from TQL in September 2022.

26.     TQL did not learn of Qureshi's plan and surreptitious screen recordings of TQL Confidential Information until approximately November 10, 2022.

27.     TQL immediately terminated Qureshi and, on the same day, recovered Qureshi's TQL-provided computer and related devices. TQL also asked for access to Qureshi's personal computer to recover TQL Confidential Information on it, but Qureshi would not allow TQL access to it.

28.     TQL immediately reviewed Qureshi's activity to determine what Confidential Information he had accessed before his termination. They found that Qureshi had conducted numerous searches of TQL's prospecting system after normal business hours between July 1, 2022 and November 8, 2022, and hours spent reviewing records accessed through the searches. They also found that Qureshi accessed client and prospective customer data, brokerage revenue, commodities shipped, the margins for those commodities, revenue figures, and bid submissions, among other things (hereinafter, the "Stolen Confidential Information"). Such searches and access would not have been part of Qureshi's regular job responsibilities with TQL, even if conducted during normal working hours.

**COUNT ONE**
**MISAPPROPRIATION OF TRADE SECRETS UNDER FEDERAL AND OHIO LAW**

29.     TQL incorporates the prior paragraphs of this Complaint as if fully rewritten herein.

30.     The Stolen Confidential Information constitute TQL's trade secrets that are subject to protection under the Defend Trade Secrets Act, 18 U.S.C. § 1836 and the Ohio Uniform Trade Secrets Act, R.C. 1333.61, *et seq.*

31.     The Stolen Confidential Information is intended for use in providing goods or services in interstate or foreign commerce. Indeed, because of the nature of the third-party logistics industry, TQL's work necessarily involves interstate services.

32.     The Stolen Confidential Information derives independent economic value by not being readily known or ascertainable through proper means by other persons who can obtain economic value from their disclosure or use, namely TQL's competitors and those who can divert business from TQL.

33.     TQL has spent significant time over many years and invested significant sums, in terms of both financial and human resources, to develop and maintain its Confidential Information, including the Stolen Confidential Information.

34.     TQL's Confidential Information, including the Stolen Confidential Information, is the subject of reasonable efforts by TQL to maintain its secrecy, including conditioning employee access to its system upon use of constantly changing passwords, restricting employees from downloading, printing, or emailing certain information, and requiring all employees to agree to sign an agreement containing confidentiality and restrictive covenant provisions the same or similar to those included in the Agreement.

35.     Qureshi's misconduct and wrongful taking of the Stolen Confidential Information constitutes misappropriation under the Defend Trade Secrets Act and the Ohio Uniform Trade

7

Secrets Act, because Qureshi has used, is threatening to use, and/or inevitably will use the Stolen Confidential Information for himself and/or a competitor to unfairly compete with TQL.

36.     At the time of such misappropriation, Qureshi knew he acquired the Stolen Confidential Information by improper means and had clear knowledge that he only had access to the Stolen Confidential Information under circumstances giving rise to a duty to maintain its secrecy.

37.     As a result of Qureshi's misappropriation, TQL has suffered and will continue to suffer damages, loss of competitive position, and irreparable harm as a result of Qureshi's use of the information to unfairly directly compete with TQL.

38.     Monetary damages alone will not be sufficient to remedy all of the harm caused to TQL by Qureshi's conduct and breach of his obligations under his Agreement and the law. As a direct and proximate result of Qureshi's unlawful conduct, TQL has suffered, and will continue to suffer, irreparable harm for which there is no adequate remedy at law.

39.     Thus, in addition to monetary damages, TQL seeks a temporary restraining order, a preliminary and permanent injunction prohibiting Qureshi from further theft and misappropriation of TQL's Confidential Information (and the Stolen Confidential Information in particular), and other non-monetary relief to be addressed in forthcoming motions for such relief.

**COUNT TWO**
**CONVERSION**

40.     TQL incorporates the prior paragraphs of this Complaint as if fully rewritten herein.

41.     The Stolen Confidential Information that Qureshi has belongs to TQL. Indeed, the Agreement is clear that "Confidential Information is for TQL's Use Only."

42.     At no time, did TQL permit Qureshi to take, use, or disclose the Stolen Confidential Information in the manner that he has, or to keep it after he was terminated. Indeed, Qureshi

8

surreptitiously circumvented TQL's protections to deprive TQL of the exclusive possession and control of the Stolen Confidential Information.

43.     Qureshi's conduct is contrary to TQL's rights as the owner of the Stolen Confidential Information.

44.     As a direct and proximate cause of Qureshi's conduct, described above, TQL has suffered monetary damages in an amount to be proven at trial, but believed to exceed the jurisdictional minimum of this Court.

**COUNT THREE**
**FAITHLESS SERVANT**

45.     TQL incorporates the prior paragraphs of this Complaint as if fully rewritten herein.

46.     As an employee of TQL, Qureshi owed a duty of loyalty to TQL.

47.     Nonetheless, Qureshi breached his duty of loyalty by: (1) facilitating the diversion of business away from TQL; (2) participating in, being employed by, consulting for, or acting to further the mission of a "Competing Business," as that term is defined in the Agreement, to unfairly compete with TQL; (3) employing, recruiting, or soliciting TQL employees to participate in his plan, in violation of his Agreement and to the detriment of TQL; (4) utilizing TQL's Confidential Information and taking the Stolen Confidential Information to benefit himself and a TQL competitor; (5) soliciting and/or preparing to solicit TQL's customers and carriers with which it contracts on behalf of himself or a Competing Business; and (6) conspiring to misappropriate TQL's Confidential Information – in particularly, the Stolen Confidential Information.

48.     Qureshi's breach of his duty of loyalty deprived TQL of the consideration it was to receive in exchange for providing Qureshi with employment and compensation for the same.

49.     As a direct and proximate cause of Qureshi's unlawful conduct, described above, TQL has suffered monetary damages in an amount to be proven at trial, but believed to exceed the

9

jurisdictional minimum of this Court. Such damages include, but are not limited to, any amounts paid to Qureshi during any periods of disloyalty to TQL.

## COUNT FOUR
## BREACH OF CONTRACT

50.    TQL incorporates the prior paragraphs of this Complaint as if fully rewritten herein.

51.    TQL and Qureshi entered into the Agreement, which is a valid and enforceable contract.

52.    In exchange for his commitment to be bound by the Agreement, Qureshi received adequate and sufficient consideration, including, without limitation, ongoing employment, extensive training, and continued access to TQL's Confidential Information to assist with his professional development.

53.    TQL fully performed all of its obligations under the Agreement.

54.    Qureshi has breached the Agreement by, among other things, failing to abide by the confidentiality obligations, as further discussed above, and restrictive covenants contained therein.

55.    As a direct and proximate cause of Qureshi's breach of his Agreement, TQL has suffered monetary damages in an amount to be proven at trial, but believed to exceed the jurisdictional minimum of this Court.

56.    Monetary damages alone will not be sufficient to remedy all of the harm caused to TQL by Qureshi's breach of the Agreement. As a direct and proximate result of Qureshi's actual or threatened unlawful conduct, TQL has suffered, and will continue to suffer, irreparable harm for which there is no adequate remedy at law.

57.    Thus, in addition to monetary damages, TQL seeks a temporary restraining order, a preliminary and permanent injunction prohibiting Qureshi from further breaches of the Agreement, and other non-monetary relief to be addressed in forthcoming motions for such relief.

10

58.     Pursuant to the Agreement, TQL is also entitled independently to recover the attorney's fees and costs expended as a result of Qureshi's conduct, in an amount to be proven at trial and/or through appropriate post-trial motions.

## PRAYER FOR RELIEF

**WHEREFORE,** TQL respectfully requests that this Court issue judgment in its favor as follows:

a)     On Count One, grant money damages in an amount to be determined at trial, as well as a temporary restraining order and preliminary and permanent injunctive relief, along with other relief, such as attorney's fees, as provided in the Agreement, and additional relief to be addressed in forthcoming motions;

b)     On Count Two, grant money damages in an amount to be determined at trial;

c)     On Count Three, grant money damages in an amount to be determined at trial;

d)     On Count Four, grant money damages in an amount to be determined at trial, as well as a temporary restraining order and preliminary and permanent injunctive relief, and award damages, attorney's fees, and other relief as provided in the Agreement;

e)     Order Qureshi to pay court costs, prejudgment interest, and post-judgment interest; and

f)     Any such other or further relief that this Court deems just and proper or that justice requires.

Respectfully submitted,

*/s/ Michael B. Mattingly*
Michael B. Mattingly (0089847)
DINSMORE & SHOHL LLP
255 E 5th St, Suite 1900
Cincinnati, Ohio 45202
Phone: (513) 977-8200
Fax:     (513) 977-8141
michael.mattingly@dinsmore.com

11

Matthew J. Bakota (0079830)
DINSMORE & SHOHL LLP
1 South Main Street, Suite 1300
Dayton, Ohio 45402
Phone: (937) 449-6400
Fax: (937) 449-2836
matthew.bakota@dinsmore.com

*Attorneys for Total Quality Logistics, LLC*

**VERIFICATION**

STATE OF OHIO           )
                                  ) ss.

COUNTY OF CLERMONT   )

I, _Marc Bostwick_ being duly cautioned and sworn, state that I am authorized to act as an agent of Plaintiff for the purpose of verifying the Complaint herein in accordance with the Federal Rules of Civil Procedure. I am personally aware of the facts related to this matter or the facts have otherwise been made known to me. The factual allegations in the Verified Complaint are true and correct to the best of my knowledge, information, and belief.

_Marc K. Bostwick_

**NOTARY**

Subscribed and sworn by _Marc Bostwick_ before me, a Notary Public, on this _17th_ day of November, 2022.

_____
Notary Public

KELLY A. PIERRO
Notary Public, State of Ohio
My Commission Expires
July 22, 2023

13